**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ACTION NISSAN, INC. d/b/a UNIVERSAL HYUNDAI
for itself and in the name of the Department of Highway
Safety and Motor Vehicles of the State of Florida,
for its use and benefit,                                      Case No.: 6:21-cv-02152

                         Plaintiff,

v.

HYUNDAI MOTOR AMERICA CORPORATION,

                         Defendant.
_____/

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 3.01, Plaintiff, Action Nissan Inc.,

d/b/a Universal Hyundai ("Universal"), files this motion seeking partial summary judgment.

## STATEMENT OF UNDISPUTED FACTS

<u>Parties and Dealer Agreement</u>

1.  Universal and HMA are parties to a franchise agreement, as defined in §

320.60(1)[1] (the "DSSA"). ECF 1-1 at 2.

2.  The DSSA obligates Universal to purchase, stock and sell Hyundai's in quantities

as necessary to fulfil its obligations under the DSSA. ECF 1-1 at 11, 13. It permits HMA

to evaluate dealer performance, and purportedly to terminate Universal if sales objectives

are not met. ECF 1-1 at 15, 25. HMA measures dealer performance using "sales

efficiency", and holds dealers accountable for this metric under the DSSA. Kim 30(b)(6)

---

[1] §§ 320.60-70, Fla. Stat. (the "Dealer Protection Act") was amended, in part, effective
July of 2023.  All citations are to the 2021 version in effect during the relevant period.

Dep. at 32:25-33:6, 33:23-34:7, June 27, 2023 (**Ex. A**). Sales efficiency is calculated by dividing dealer sales in a time period by their expected sales. *Id.* at 33:7-22.

3.   The DSSA obligates HMA to use its "best efforts" to supply Universal with inventory, and when supply is short requires that HMA allocate product "in a fair and equitable manner." ECF 1-1 at 11. HMA defines "best efforts" to mean that it will distribute vehicles "to the dealer network in an equitable fashion." Ex. A at 12:6-13:4.

<u>Universal's Prior Lawsuit Against HMA and Universal Inventory</u>

4.   Universal sued HMA in 2018 to enforce a settlement agreement the parties previously entered. *See Action Nissan, Inc. d/b/a Universal Hyundai and William Nero v. Hyundai Motor America and Genesis Motor America*, Case No. 6:18-cv-WWB-EFK (the "Prior Lawsuit"), ECF 1. After trial, judgment was entered in favor of Universal on October 19, 2021 for sixteen million dollars. Prior Lawsuit, ECF 314.

5.   During and after the Prior Lawsuit, Universal received less inventory from HMA proportional to other dealers in the State of Florida or the Southern Region. May 27, 2021 Letter to HMA (ECF 1-3); Dec. 13, 2021 Letter to HMA (ECF 1-5).

6.   Universal's sales rankings declined after the Prior Lawsuit. In December of 2019, Universal was the eight highest volume Hyundai dealer (year to date) in the country; in December of 2020, Universal dropped to eleventh; in December of 2021 it dropped to twelfth; and by April of 2022 it was not even in the top twenty Hyundai dealers. (PLT 000797, PLT00807, PLT000957, PLT000965, PLT001008, PLT001018, PLT001058, PLT001070, together attached as **Ex. B**).

7.   Universal was not allocated enough vehicles to meet HMA's sales efficiency objectives. For 2021, Universal was expected to sell 3,216 units but allocated 2,012 units;

and for the first half of 2022, Universal was expected to sell 1,571 units, but allocated 1,088 units.[2] Stockton Report Tab 24 pp. 1-8 (**Ex. C**); PLT012686-689 (**Ex. D**). HMA also failed to allocate Universal enough units to maintain its sales share from 2020 Q3 through 2022 Q2, as Universal's allocation was deficient by 1,054 to 1,389 units, depending on whether all Florida Hyundai dealers are considered or only the Southern Region. Ex. C. Universal's sales share decreased disproportionately to other dealers, as Universal's sales share dropped over 30%, from 3.77% in 2019 to 2.62% in 2022 Q1—more than all but one dealer, Jenkins. Gardemal Supplement, Ex. 22A/22B (**Ex. E**). HMA was aware of Universal's low inventory. (D_001215, D_001270, D_001465, D_001857, D_002018, D_002369, D_003246, together attached as **EX. F**). Dealers cannot sell vehicles they do not have. Quezada Dep. at 105:11-14 (**EX. G**).

8. On May 27, 2021, Universal sent a letter to HMA informing it that Universal was running low on inventory and requesting additional inventory. ECF 1-3.

9. HMA responded on June 14, 2021, stating that Universal had a similar level of inventory as approximately 25% of the dealers in Florida (but less inventory than 75% of the dealers in the state), and that Universal received "more than its fair share" of inventory. ECF 1-4. Receiving "more than its fair share" only meant that Universal received manual allocation in addition to formulaic. Kim Dep. at 251:24-253:18, June 22, 2023 (**Ex. H**).

10. Universal's inventory levels continued to suffer, and Universal sent another letter on December 23, 2021, again asking for additional inventory. ECF 1-5. HMA did not respond, and this lawsuit was filed on December 23, 2021. ECF 1 at ¶ 49.

---

[2] Ex. C shows actual allocation by quarter; Ex. D show HMA's sales expectations.

11. According to HMA, dealers can maximize their inventory by "properly manag[ing] their inventories as well as their sales velocity and their sales rates" as sales velocity was the "primary driver", and HMA based "a lot of our decisions on dealer performance and their ability to maximize sales velocity." Ex. A at 21:12-24:1, 30:9-31:16, 40:13-15. Throughout the relevant time period, Universal's sales velocity and sales rates were mostly above regional average, including the dealers earning the most discretionary allocation[3]. Ex. A at 64:8-20; Stockton Report, Tab 19, 20 (**Ex. I**).

HMA's Allocation Systems and Supply Shortages

12. HMA has two systems of allocation, formulaic allocation and manual. Quezada Decl. at ¶ 4 (**Ex. J**). Formulaic allocation is also referred to as "system" or "systematic" allocation. Discretionary allocation constitutes a part of the manual allocation system.

13. Hyundai vehicles have generally been in short supply, at least between March of 2021 and June of 2023. Ex. A at 24:2-8. Universal, and other Hyundai dealers, have been selling through their entire inventories during this shortage, making it "a pretty safe assumption that any dealer that got allocated vehicles in that period would have sold more." Ex. A at 182:18-184:21, 209:11-21.

14. The formulaic system does not consider dealer identity or HMA's sales objectives/expectations for dealers. Quezada Ex. G at 105:2-10; Ex. J at ¶ 13.

15. HMA does not distribute all of the vehicles it produces to dealers via the formulaic system, instead some vehicles are sold under fleet sales and some are used for manual allocation by HMA. Ex. A Dep. at 14:1-15:6; Ex. J at ¶ 4.

---

[3] "Discretionary" allocation is a subset of its manual allocation system.

16. HMA withholds five percent of its total vehicle production to create a reserve pool of vehicles for "national needs". Ex. G at 34:20-35:16. HMA then distributes the remaining vehicles to regions for use in the formulaic system, but each region withholds up to fifteen percent the vehicles it receives for manual allocations, these regional reserves are referred to as the "GM pool" or "General Manager Pool." Ex. G at 66:11-67:11, 69:23-70:6; Ex. A at 32:15-20.

17. DSSA section 10.A.1 applies to manual, or discretionary, allocations, which must be distributed in a "fair and equitable" manner and by HMA's "best efforts." Ex. A at 79:25-80:8; ECF 1-1 at 11.

18. HMA claims to have no other written policies or guidelines as to how manual allocation is distributed, outside of its Business Policy and Procedures manual, which only requires manual allocation be assigned one of the following reason codes: 01 – Buy/Sell; 02 – Open point; 03 – Facility Assistance; 04 – Sold Order; 05 – General Manager Pool; 06 – Vehicle Seeding; and 07 – Sales Event. D_000001-74 at pp. 41, 42 (**Ex. K**); Ex. A at 79:12-80:8; Harriman 30(b)(6) at 15:11-16:2 (**Ex. L**). From 2019-June of 2022, over 95% of manual allocation codes were either blank (meaning no code was assigned) or labeled "general discretionary" (which is the same as GM Pool). Stockton Report Appendix at p.9-13 (**Ex. M**).

Allocation Materials Provided to Dealers

19. HMA does not provide its allocation manuals to its dealers, does not tell dealers what factors are considered for discretionary allocation, and does not tell dealers how much discretionary allocation is available. Ex. A at 143:2-5, 149:3-25; Ex. K at p.6 (noting that dealers will not receive the manual). HMA only provides its dealers with limited

information on the formulaic allocation system, with no explanation of the manual system. PLT008402-403 (**Ex. N**).

<u>HMA's Manual Allocation Factors</u>

20. On April 19, 2022, HMA national executives communicated to regional employees regarding manual allocations to dealers in litigation or who had not commended the GDSI 2.0 Program, the message being that HMA does not support such dealers. D_004329 (**Ex. O**).

21. In in July of 2022 (in a different lawsuit), HMA claimed it makes manual allocation decisions based primarily on three factors, including "whether the dealer has participated in Hyundai programs such as an HDAA, invested in the brand, including facilities, and whether the dealer is involved in litigation with HMA and the nature of any such litigation." *Hyundai Motor America* v. EFN West Palm Motor Sales, LLC et al, Case No. 9:20-cv-82102, Southern District of Florida, ECF 327 at p. 17 (**Ex. P**).

22. Less than a year later, the list of factors increased to ten:

Specifically, in determining whether, and how to, allocate discretionary units throughout the Southern Region, HMA's regional management considers: (1) how to maximize the amount of allocation that will be given to the Southern Region; (2) how to grow and maximize the Southern Region's sales volume and performance; (3) increasing sales velocity; (4) each dealer's sales performance, "balanced day supply" of vehicles, their pipeline days supply, sales velocity, and the number of vehicles needed to bring dealers up to a certain level of inventory; (5) whether HMA had specific programs or initiatives that the company was working towards; (6) whether a dealer participates in HMA sponsored programs or initiatives, including but not limited to those intended to increase a dealer's new vehicle sales and awareness of the Hyundai brand in the market; (7) whether a dealer is in litigation with HMA and the nature of that litigation; (8) whether a dealer participates in a Hyundai Dealer Advertising Association ("HDAA"); (9) the available mix of vehicle models in the discretionary pool; and (10) whether there is a specific tactical market action HMA wants to support in an effort to strategically grow sales in that area. HMA's Supplemental Interrogatory Responses dated May 8, 2023. ECF 87-1 at 3-4.

23. HMA admits that this list is of factors is still incomplete. Ex. A at 120:2-121:14. HMA also admits that factors are not always considered, and that some only apply to certain timeframes. Ex. A at 125:6-128:17; ECF 120 at 6.

24. HMA claims that litigation, facility programs, and sales velocity counted against Universal's allocation. Ex. A at 51:3-52:5.

<u>The Discretionary System Factors are a Farce</u>

25. HMA does not keep written records describing discretionary allocation, except the reason codes discussed above. Ex. A at 31:25-32:14. HMA has no written policy describing how discretionary allocation is distributed. Ex. A at 80:17-81:2. HMA claims to not know where factors, including the litigation factor, originated. Ex. A at 83:14-20. HMA admitted that discretionary allocation was not really scrutinized prior to 2021, and that HMA changed "what we considered and how we considered it". Ex. A at 55:17-57:22.

26. Numerous witnesses provided testimony contradicting the existence or use of the factors above. Alan Harriman, as a corporate representative, denied that there was (1) any policy to withhold allocation from dealers involved in litigation with HMA; (2) any policy to withhold or limit allocation from dealers who are not involved in an ad association such as the HDAA; (3) any policy relating to allocation of vehicles relating to the GDSI program. Ex. L at 12:6-13:3, 13:4-8, 16:3-5. HMA's current Regional Manager for the Southern Region, Michael DePaul, testified that he has never seen the ten factors listed in HMA's written discovery responses, and that it is not part of any HMA policy. DePaul Dep. at 94:2-24 (**Ex. Q**); ECF 87-1 at pp. 3-4. Depaul also testified that there is no allocation obligation under GDSI 2.0 or the Accelerate program, but it is "standard practice" to manually allocate vehicles based on GDSI 2.0 completions. Ex. Q 92:21-93:18. When

asked about discretionary allocation factors, Tim Turbyfield testified that the region was given "a directive that… there were certain dealers that were – we were not at liberty to distribute allocation to" from "national." Turbyfield Dep at 71:23-72:15, April 14, 2023 (**Ex. R**). Universal was one of those dealers, and was excluded from allocation due to its litigation with HMA. Ex. R at 75:2-76:11, 76:24-78:7.

27. HMA attempted to provide an explanation as to why discretionary allocation was provided to specific dealers after being ordered by the Court, and only provided explanations for six months. ECF 119-6 at pp. 4-13; ECF 104 at p. 2. HMA, through a corporate representative, testified that it had nothing to add to these responses, and that it had no "specific information" about any months not listed in these responses. Kim 30(b)(6) Dep. at 224:14-229:6, August 3, 2023 (**Ex. S**).

28. In reality, HMA uses the litigation "factor" to strong-arm dealers into settling lawsuits. Ex. A at 128:18-129:7 (explaining that if a dealer entered into litigation to "protect itself", but then "continued dialogue" with HMA and "wasn't asking for something that was…unreasonable", HMA would consider the request.)

29. HMA specifically claims that it provides manual allocation to "fulfill obligations" under facility programs, such as GDSI 2.0, and notes that Braman Hyundai (also in litigation with HMA) received additional allocation because it completed GDSI 2.0. ECF 119-6 at pp. 3, 12. But none of HMA's written agreements relating to the Accelerate program, or GDSI 2.0, provide for additional allocation or obligate HMA to provide allocation. Ex. Q 92:21-93:18; Whitt Dep. at 22:9-23:5 (**Ex. T**); Parker Dep. at 73:9-25 (**Ex. U**).

30. Universal commenced under the GDSI program on March 31, 2022, but was also specifically told that there is no allocation component of the Accelerate Program, contradicting HMA's claim that facility programs factor into manual allocation decisions. (PLT003342, PLT003305, together attached as **Ex. V**).

31. HMA had a written distribution policy for manual allocation, which it claims to no longer be in effect because "our counsel told us that it's not anymore", but HMA has no indication as to "when it went out or why" and claims to not have a current written policy. Ex. A at 92:14-94:4; D_004876 (**Ex. W**). This manual, however, requires HMA to follow very specific rules for manual allocations, and lays out a document retention policy for specific documentation supporting such allocations.. Ex. W at pp. 3, 5, 6.

32. Manual allocation emails and spreadsheets show Universal was zeroed out from discretionary allocation specifically due to legal actions, demonstrate that Universal's days supply was routinely below that of other Florida dealers, and shows that Universal received no discretionary allocation at all in Q1 of 2022. D_001179-180, D_001185-186, D_001191-192, D_001384 (**Ex. X**); *see also* ECF 119-6 at p. 5.

<u>Floor Plan Issue</u>

33. Section 13.B of the DSSA requires that Universal maintain a floorplan credit line ""to meet its ongoing obligations" but allows Universal to choose the financing source. ECF 1-1 at 20. The floorplan limit is set by HMA. ECF 1-1 at 20 ("DEALER agrees to obtain, maintain and increase as **HMA may require**, adequate flooring and lines of credit…") (emphasis added.); Nero 30(b)(6) Dep. at 139:3-6, June 1, 2023 (**Ex. Y**).

34. Universal exceeded its floorplan limit at the beginning of the COVID-19 pandemic. Ex. Y at 138:5-12.

35. Universal's financing source, Truist Bank ("Truist"), sent a letter to HMA dated April 9, 2020, notifying HMA that Universal's "floorplan balances" exceeded the credit limit, and that Truist would not pay for additional vehicles shipped to Universal. ECF 100-3. The letter was delivered by overnight courier, per the drafting letter instructions, and received and signed for by HMA on April 10, 2022. D_005100 at p.1 (**Ex. Z**). HMA requested future notices to occur via email instead of courier, but did not deny that it signed for the letter. *Id.*

36. HMA routinely holds vehicles at port for dealers when requested, and does not charge dealers for holding the vehicles at port even if a dealer is on finance hold. Harriman Dep. at 108:8-110:20, 111:6-9 (**Ex. AA**). During Q2 2020, "many dealers were on hold…because of business conditions." Ex. AA 110:21-111:4.

37. Universal also offered to purchase some or all of the vehicles which were turned down by check, but HMA refused the option. D_003963 (**Ex. BB**).

38. Truist reopened the floorplan credit line on April 27, 2020. D_002732 (**Ex. CC**).

## LEGAL ARGUMENT

Plaintiff seeks summary judgment as to liability on the claims discussed herein.

### I. Statutory Claims

Plaintiff brings claims under the Dealer Protection Act. "The Florida Legislature enacted the Dealer Protection Act … to ameliorate the abusive tactics and harsh practices automobile manufacturers commonly imposed on their franchisees." *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of N. Am., Inc.*, 32 F.3d 528, 533-34 (11th Cir. 1994). The First DCA observed the "legislative intent was to redress the economic imbalance which customarily exists between national manufacturers and local dealers." *Int'l Harvester Co.*

*v. Calvin*, 353 So. 2d 144, 147 (Fla. 1st DCA 1977); *see also Action Nissan, Inc. v. Hyundai Motor Am.,* 617 F. Supp. 2d 1177, 1201 (M.D. Fla. 2008)("To begin, the [the DPA] is a remedial statute and therefore should be construed broadly."); *Dick Winning Chrysler– Plymouth of Ft. Myers, Inc. v. Chrysler Motors Corp*., 750 F.2d 895, 898 (11th Cir.1985) (The DPA was "enacted to facilitate the legislative intent of ensuring fair dealing between motor vehicle manufacturers, motor vehicle dealers, and motor vehicle consumers.")

Universal and HMA are parties to a franchise agreement. Facts ¶1. Thus, the Dealer Protection Act applies to this dispute between a motor vehicle dealer and distributor.

A. <u>Count I – Violation of § 320.64(18), Florida Statutes</u>

Section 320.64(18), Fla. Stat. prohibits HMA from establishing or implementing:

> a system of allocation or distribution of motor vehicles to one or more of its franchised motor vehicle dealers which reduces or alters allocations or supplies of new motor vehicles to the dealer to achieve, directly or indirectly, a purpose that is prohibited by <u>ss.320.60</u>-<u>320.70</u>, or which otherwise is unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicles dealer or dealers. An applicant or licensee shall maintain for 3 years records that describe its methods or formula of allocation and distribution of its motor vehicles and records of its actual allocation and distribution of motor vehicles to its motor vehicle dealers in this state. As used in this subsection, "unfair" includes, without limitation, the refusal or failure to offer to any dealer an equitable supply of new vehicles under its franchise, by model, mix, or colors as the licensee offers or allocates to its other same line-make dealers in the state.

HMA has violated 320.64(18) in at least two ways. First, HMA's manual allocation system[4] reduced the supply of new vehicles to Universal to achieve a purpose that is directly prohibited by the Act. Specifically, § 320.64(10) (b, c,) only allows licensees (e.g., HMA) to tie allocation to facility renovations as a part of a "writing voluntarily agreed to by the dealer", and only when substantially similar terms are made available to all other

---

[4] Manual allocation is one of HMA's distinct allocation systems. Facts ¶12.

dealers. Section 320.64(10)(e) further provides that a "licensee or its common entity **may not take or threaten to take any action that is unfair or adverse to a dealer who does not enter into an agreement with the licensee pursuant to paragraph (c)**." (Emphasis added). In other words, allocation can only be tied to facility projects if offered to all dealers in the state, on similar terms and via written agreement. But HMA has reduced allocation to Universal, at least in part, because Universal did not complete facility renovations. Facts ¶¶20-22, 24, 32. However, the manual allocations HMA claims it provided to dealers to "fulfill obligations" under the GDSI 2.0 program are not part of any written agreements. Facts ¶¶26, 29; ECF 119-6 at p. 3. HMA also expressly told Universal that additional allocation was not a part of the Accelerate Program, while providing allocation to other dealers under the Accelerate program—meaning HMA did not offer the allocation to all dealers on similar terms. Facts ¶¶21, 22, 29, 30; ECF 119-6 at p. 12.

Second, HMA's manual allocation system violates § 320.64(18) because HMA has not maintained "3 years records that describe its methods or formula of allocation and distribution" under the manual system. Fla. Stat. § 320.64(18). The statute is clear that the maintenance of such records for three years is mandatory by its use of the word "shall". *See Shands Teaching Hosp. & Clinics, Inc. v. Sidky*, 936 So. 2d 715, 721 (Fla. 4th DCA 2006) (noting that the word "shall" has a "mandatory connotation", as opposed to the word "may", which is permissive.). HMA admits that its manual allocation is an allocation "system." Facts ¶12. HMA does not maintain written records that describe its "methods or formula of allocation and distribution" for its manual allocation system, but has instead identified elusive and evolving "factors" it uses to distribute manual allocations. Facts ¶¶20-23, 25, 26. HMA's own employees also contradict the existence

or use of the "factors" identified in this matter, these factors are not shared with dealers, and there is no written record of these factors prior to this litigation. Facts ¶¶19, 25, 26. While HMA once had a written policy that required records retention on this allocation system, it now claims that policy is no longer in effect. Facts ¶31. Because HMA has no written records explaining its manual allocation methods, it refused to provide detailed records of how or why its manual allocation was distributed until ordered by the Court to explain its manual allocation decisions for six months. Facts ¶27. In reality, HMA has devised these factors solely for the purpose of litigation, and has attempted to craft ad hoc explanations and methods after the fact. The only "factors" which appear to have any evidentiary support are the two that deal with litigation and facilities, and that support does not come close to the "3 years records that describe its methods or formula of allocation and distribution" required by the statute. Facts ¶20, 32.

Factors created by HMA for the purpose of litigation, which HMA claims were only communicated verbally (and only to its employees) and which lack any record prior to litigation, cannot possibly constitute the "records that describe its methods or formula of allocation and distribution" required by §320.64(18). The purpose of requiring licenses, such as HMA, to maintain these records for three years is precisely so that the dealers may challenge the fairness of an allocation system. Absent such records, there is nothing concrete *to be challenged*. As a result, HMA's failure to properly maintain such records pursuant to §320.64(18) should result, at the very least, in the presumption that HMA's manual allocation system violates the statute. HMA's pivoting and squirming to conform reality to its litigation position in this matter and other similar litigation with dealers is

unavailing, and even based on the facts that remain undisputed, warrants summary judgment.

**B.  Count III– Violation of § 320.64(22), Florida Statutes**

It is a violation of §320.64(22) where a licensee:

> … has refused to deliver, in reasonable quantities and within a reasonable time, to any duly licensed motor vehicle dealer who has an agreement with such applicant or licensee for the retail sale of new motor vehicles and parts for motor vehicles sold or distributed by the applicant or licensee, any such motor vehicles or parts as are covered by such agreement. Section 320.64(22), Fla. Stat. (2021).

This provision prohibits HMA from refusing to deliver a "reasonable quantit[y]" of vehicles to Universal. Not only has HMA refused to deliver a reasonable quantity of vehicles to Universal, it withheld inventory as a result of Universal's lawsuits.

**1.  There is No Disputed Issue of Material Fact that HMA Refused to Provide Universal with a Reasonable Quantity of Vehicles**

This provision requires HMA provide a reasonable quantity of vehicles to Universal, which it has not done. The DSSA requires that Universal meet performance goals, and also requires that Universal purchase enough inventory to fulfil its obligations. Facts ¶2. "Sales efficiency" is the standard HMA uses to gauge dealers' satisfaction of their sales obligations, and is calculated by dividing a dealer's actual sales by what HMA expects the dealer to sell (based on the sales of other dealers in the state). *Id.* However, Universal has not been allocated enough vehicles to meet its sales expectations under this metric. For the 2021 calendar year HMA expected Universal to sell 3,216 vehicles, but only allocated it 2,012 vehicles; and for the first half of 2022 Universal was expected to sell 1,571 units, while only being allocated 1,088. Facts ¶7. HMA's sales expectations are about 50% *higher* than the actual allocation provided. This is because HMA's allocation systems do not consider dealer sales objectives when distributing inventory. Facts ¶14.

A failure to allocate Universal enough inventory to meet sales obligations set by HMA demonstrates HMA's refusal to provide Universal with a "reasonable quantity" of inventory.

HMA also failed to allocate Universal enough inventory for it to maintain sales share in the market. If allocation remained fair and proportional, Universal's sales share should have remained relatively static throughout the past few years. Even with allocation shortages, sales share should remain static if HMA's allocation comported with the §320.64(22), because any shortage should impact all Hyundai dealers equally. This is especially true here, as during this time period all dealers were able to easily sell the inventory available to them. Facts ¶13. However, HMA did not allocate Universal enough units to maintain its sales share either—for example, from Q3 of 2020 through Q2 of 2022, Universal's total allocation was at least 1,054 units short of the number needed to maintain its sales share. Facts ¶7.

Universal, or HMA employees on behalf of Universal, requested additional inventory multiple times. Facts ¶¶7, 8, 10. In response to one request, HMA claimed Universal received "more than its fair share" of allocation over the prior three months, and claimed that having less inventory that 75% of other dealers was normal—HMA did not offer any additional allocation at this point. Facts ¶ 9. Further, HMA intentionally excluded Universal from manual allocations based on litigation between the parties. Facts ¶¶20, 24, 26, 32; ECF 119-6 at p.5. To the extent that the evidence references allocation based on facility construction or renovations, Universal contends that HMA is prohibited from providing allocation in exchange for facility renovations unless certain requirements are met, (which

they were not), as explained *supra*. This leaves litigation as the sole explanation for HMA's unfair treatment of Universal.

Universal has been involved in two separate lawsuits against HMA, this current lawsuit, and the Prior Lawsuit. Universal won the Prior Lawsuit after a jury determined that HMA breached a contract, and Universal was awarded damages. Facts ¶4. The current lawsuit alleges that HMA is, at least in part, withholding inventory from Universal in retaliation to Universal's litigation, which the evidence supports. *See* ECF 1; Facts ¶¶20, 24, 26, 32; ECF 119-6 at p.5. In summary, Universal sued HMA for breach of contract, and for refusing to provide Universal with adequate inventory (which is required by contract and statute). Condoning HMA's refusal to provide allocation to its dealers based on litigation of this nature would have a chilling effect on dealers seeking redress for the wrongs of manufacturers/distributors and would largely nullify the Dealer Protection Act—a remedial statute designed to protect dealers from such coercive acts.

## II.  Count IV – HMA's Breach of the Dealer Agreement

It is undisputed that HMA and Universal are parties to the DSSA. Facts ¶1. The DSAA imposes obligations on both HMA and Universal. *Inter alia*, Section 10.A.1 requires that Universal must purchase enough inventory from HMA to fulfil its obligations under the agreement, and that HMA must use its "best efforts" to provide Universal with inventory, which includes allocating inventory "in a fair and equitable manner" when there is short supply. ECF 1-1 at 11. HMA deems "best efforts" to mean that it will distribute vehicles in an equitable fashion. Facts ¶ 3. HMA admits that this provision applies to manual allocation. Facts ¶17. Section 10.E permits HMA to evaluate Universal's sales performance, and section 16.B.3 permits HMA to terminate Universal, subject to certain

conditions, for unsatisfactory performance. ECF 1-1 at 15, 25. Universal has diligently and completely complied with its obligations under the agreement, and has even requested additional inventory from HMA. Facts ¶8, 10, 11. However, HMA breached its obligations by failing to use its best efforts to allocate inventory to Universal and by distributing inventory in a manner that is not fair and equitable.

As noted above, Universal has not been allocated enough inventory to meet its sales expectations (which are set by HMA), or to maintain sales share in the market. Facts ¶7. As a result, Universal's sales share dropped disproportionately to other dealers in the state. Facts ¶6. However, Universal's sales velocity was above the regional average for nearly the entire relevant time period, while its days supply was typically below the regional average, both indications that it should have received more allocation.[5] Facts ¶11. HMA's failure to allocate Universal enough vehicles to meet HMA's own sales expectations, or to maintain Universal's sales share, is clear evidence that HMA did not use its "best efforts" to provide Universal with inventory, nor did HMA allocate vehicles in a fair and equitable manner as required by the DSSA.

Further, HMA deliberately withheld inventory from Universal due to litigation between the parties. This is evidenced by internal HMA emails, spreadsheets, testimony, and discovery responses. Facts ¶¶20, 24, 26, 32; ECF 119-6 at p. 5. Notably, nothing in the DSSA prohibits Universal from litigating against HMA, nor does it permit HMA to withhold inventory as a result of any such litigation. *See generally* ECF 1-1.

---

[5] For clarification, sales velocity generally refers to how fast a dealer sells vehicles (e.g., volume over time), while days supply refers to how many days of inventory the dealer has before they sell out based on their sales velocity.

HMA's failure to provide Universal with enough inventory to meet contractual obligations, *or* to maintain sales share, along with HMA's efforts to deprive Universal of inventory based on litigation, breach the "best efforts" and "fair and equitable manner" obligations articulated by the agreement. Accordingly, Universal is entitled to judgment as a matter of law on Count IV.

I. **HMA's Counterclaims**

A. **Breach of Contract**

HMA's claim that Universal breached the DSSA by "failing to maintain flooring and lines of credit adequate to meet its ongoing obligations" is demonstrably false. ECF 118 at ¶ 179. HMA's potential damages are also expressly limited by the contract.

Section 13.B of the DSSA only requires Universal to "obtain, maintain and increase as HMA may require, adequate flooring and lines of credit…" ECF 1-1  at 20. HMA sets the floorplan limit, not Universal. Facts ¶33. Contrary to HMA's claim, Universal complied with the DSSA and maintained the floorplan limit set by HMA, although Truist refused to make additional payments *above* that limit—and Truist informed HMA it would "not pay [HMA] for additional new Hyundai units sold …" after the limit was exceeded. Facts ¶35. If you have a credit card with a limit of five-thousand dollars, that credit line does not disappear because the limit was reached—the credit card simply does not work unless you request to raise the limit or pay down the balance. As such, HMA misleads the Court by casting this as a breach by way of failure to maintain the credit line. As HMA notes, vehicles shipped to dealers are put on a floorplan credit line. ECF 118 at ¶ 156. Once the dealer sells a vehicle, it is removed from the floorplan. Thus, a floorplan can exceed the required limit during market fluctuations or periods when vehicle sales abruptly halt (as

shipments are still coming in, adding vehicles to the floorplan, without sales occurring to remove vehicles). Universal's floorplan limit was exceeded in April of 2020, at the start of the COVID-19 pandemic—this is unsurprising as the entire country was sheltering in place, not vehicle shopping.  In any event, the credit line was available for use again mere days after HMA contends it learned of the issue. Facts ¶38; ECF 118 at ¶¶162-164.

HMA's allegation that "Truist Bank often permitted Universal to exceed the floorplan limit" is a red herring. ECF 118 at ¶ 158. Assuming, *arguendo*, that Truist permitted Universal to exceed its floorplan limit, Truist's refusal to do so in this specific instance, or Universal's refusal to further expose itself past its credit limit, is not a breach of any provision of the DSSA.

HMA's breach claim also fails because it did not satisfy conditions precedent. Section 10.A.4.c expressly covers situations where a dealer "should fail or refuse or for any reason be unable to take delivery of any Hyundai Products". ECF 1-1 at 12. That provision limits HMA's damages to "the charge of returning the products to the original point of shipment, plus any demurrage, storage, or related charges." *Id.* It also creates a condition precedent that HMA make a demand for any such costs. *Id.* HMA made no such demand, and is thus precluded from recovering damages on this claim.

## B. **Fraud**

### 1.  HMA' Fraud Counterclaim is Precluded by the Economic Loss Rule

It is clear that HMA's fraud claim arises from Universal's alleged breach of the contract, but nothing else about the claim is clear. Unfortunately for HMA, Florida applies the Economic Loss Rule, which holds when a party alleges fraud which "relates to the performance of the contract the economic loss doctrine will limit the parties to their

contractual remedies." *Boucher v. Dell Marine, LLC*, 3:08-CV-704-J-34MCR, 2009 WL 10670780, at *3 (M.D. Fla. Mar. 18, 2009) (Internal citations omitted). *See also Hotels of Key Largo, Inc. v. RHI Hotels, Inc.,* 694 So. 2d 74, 78 (Fla. 3d DCA 1997) ("[W]here the alleged fraudulent misrepresentation is inseparable from the essence of the parties' agreement, the economic loss rule applies and the parties are limited to pursuing their rights in contract."). As HMA complains about Universal's performance under the DSSA, the alleged fraud cannot stand as an independent tort as a matter of law.

i.    There is No Disputed Issue of Material Fact

HMA cannot satisfy *any* elements of a claim for fraud. "The four essential elements of fraud under Florida law are: (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." *Hepp v. Paul Revere Life Ins. Co.*, 120 F. Supp. 3d 1328, 1346 (M.D. Fla. 2015) (internal quotes omitted).

First, HMA does not identify a statement or omission that Universal made to HMA. HMA does not even identify whether the fraud was an affirmative misrepresentation or intentional omission. The counterclaims fail to elucidate whether HMA contends that Universal failed to notify it of the floorplan issue, or Universal mislead it. Instead, HMA alleges that Universal "instructed its floorplan financer to artificially turn off… its floorplan financing in order to avoid multiple shipments of Hyundai vehicles." ECF 118 at ¶ 184. This is an alleged statement from Universal to Truist, not to HMA. Next, HMA claims that "Universal failed to timely inform HMA that its floorplan financing had been suspended." ECF 118 at ¶ 185. If this is the omission relied upon, Universal refutes that the credit line was suspended—it remained intact, Truist simply refused to exceed the agreed credit

limit. Facts ¶35. Further, Universal has no obligation to notify HMA of such actions by its financer, and HMA has pointed to no such obligation. HMA also omits that it *did* receive timely notification from Truist, the party refusing to exceed the agreed to credit limit. The notice, dated April 9, 2020, was delivered by overnight courier and signed for by HMA the very next day. *Id*.

The second element necessarily fails with the first under these facts, because Truist made the only possible statement that HMA could have relied upon, and the facts disprove any alleged omission. In any event, Universal's principal (Mr. Nero) believed the floorplan limit had been exceeded. Facts ¶34.

The third element is the most interesting. HMA claims that Universal's scheme was to *avoid* shipments. ECF 118 at ¶184. However, HMA shipped vehicles despite receiving notification that Truist would not pay for them—thwarting any possible intention Universal may have had to avoid shipments. Facts ¶35. Universal also offered to purchase some or all of the vehicles shipped by alternate methods, including by check—but HMA refused. Facts ¶37. If Universal's intention was to avoid shipments, it would not have offered to purchase the vehicles. Universal could have also just asked HMA to hold vehicles at port for an indefinite period of time, and have them shipped later. Facts ¶36.

The fourth element requires a "consequent injury by the other party acting in reliance on the representation." *Hepp*, 120 F. Supp. 3d at 1346. If HMA relied on the statement by Truist, it would not have shipped the vehicles, and thus would not have been harmed because it could have simply shipped the units to a different dealer. Universal also offered to pay for the units despite the floorplan hold, which HMA rejected, nullifying any claim that HMA was damaged. Further, to the extent that HMA claims *any* damage,

section 10.A.4.c of the DSSA, as discussed above, requires that HMA make a demand for payment. HMA never made any such demand, nor does it plead that it did.

In reality, Universal exceeded its floorplan credit limit and Truist refused to pay for additional vehicles after the credit limit was exceeded—effectively putting the floorplan on hold until enough vehicles were sold for the balance to recede. Facts ¶35. This is not fraud, but Truist's right under the credit line, and HMA has not pointed to anything obligating Truist to allow Universal to exceed its floorplan limit.

## II. <u>HMA's Affirmative Defenses</u>

HMA's defenses of unclean hands must fail with its fraud counterclaim, and the first breach defense must fail with its counterclaim of breach. The affirmative defenses also fail for the reasons provided below. HMA's other defenses merely point out alleged defects in the claims, and are not true affirmative defenses. *See Gulfstream Aerospace Corp. v. Gulfstream Unsinkable Boats, LLC*, 530 F. Supp. 3d 1167, 1171 (M.D. Fla. 2021).

### A. <u>Doctrine of Unclean Hands</u>

HMA's fifth affirmative defense is that Universal's claims are barred by the doctrine of unclean hands. "Under the doctrine of unclean hands, '[o]ne who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law.'" *In re Pope*, 6:21-CV-1149-WWB, 2022 WL 16859665, at *6 (M.D. Fla. Sept. 22, 2022) quoting *Gastaldi v. Sunvest Resort Cmtys*., LC, 2010 WL 457243, at *8 (S.D. Fla. Feb. 3, 2010). *Gastaldi* explains "The conduct constituting the unclean hands must generally be connected with the matter in litigation and must affect the adverse party." *Id.* (Internal citations omitted). The Court goes on to explain that

"connected" means "[i]t is, in essence, the reason for the lawsuit; the unclean-hands conduct must be closely connected to that." *Id. See also Electrostim Med. Services, Inc. v. Lindsey,* 2012 WL 1405707 at *11, (M.D. Fla. Mar. 13, 2012), report and recommendation adopted, 2012 WL 1405681 (M.D. Fla. Apr. 23, 2012)(rejecting unclean hands defense where Defendant had no knowledge of the basis for claim "until after the initiation of this suit").

HMA admits it had no knowledge of Nero's alleged request to "suspend" the floorplan until 2023, well after filing of this suit. ECF 100 at 3. HMA also fails to allege that Universal's actions in April 2020 caused HMA's refusal to provide allocation. *See generally* ECF 118. HMA's actions in this lawsuit, e.g. failing to provide adequate inventory to Universal, were not in response to Universal's alleged action(s) which predicate HMA's defense of unclean hands—they are not connected.[6]

Even if unclean hands were "connected" with the reason for the lawsuit, HMA's defense would still fail, because it is an equitable defense and insufficient as a matter of law. "The doctrine of 'unclean hands' is an *equitable* test that is used by courts in deciding *equitable fate*." *United States v. Howell*, 425 F.3d 971, 974 (11th Cir. 2005) (emphasis added). It is "not applicable" to claims for legal relief where one seeks to recover damages. *See e.g. Thrive HR AO, LLC v. Dallas Nat'l Ins. Co.,* 2012 WL 13106070, at *3 (M.D. Fla. Jan. 13, 2012). Courts have also explicitly ruled on the inapplicability of unclean hands to fraud claims seeking monetary damages. In *Adana Investing, Inc. v. Wells Fargo Bank N.A.*, 2017 WL 3668553, *10 (S.D. Fla. April 10, 2017) the Court rejected

---

[6] This is not to say the refused cars are irrelevant, as experts have evaluated the cars offered and received by Universal in reaching their conclusions about damages.

defendant's attempts to claim unclean hands as a defense in the absence of claims for equitable relief. As an equitable defense, the doctrine of unclean hands is inapplicable to Universal's legal claims for monetary damages, and *cannot* survive in a cause of action for legal relief.

To the extent the complaint seeks equitable remedies, such as an injunction, it does so under section 320.695 Fla. Stat. which provides:

> In addition to the remedies provided in this chapter, and notwithstanding the existence of any adequate remedy at law, the department, or any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer, is authorized to make application to any circuit court of the state for the grant, upon a hearing and for cause shown, of a temporary or permanent injunction, or both…

The state's interest factors into this consideration. This regulatory provision is designed to prevent ongoing statutory violations. If HMA is violating state law, it would make no sense to allow them to avoid an injunction to prevent future violations, whether Universal also engaged in wrong behavior or not. As the injunction is in the name of the state, and the state did not act with unclean hands, the defense should not lie. *See Mitchell Bros. Film Group v. Cinema Adult Theater,* 604 F.2d 852 (5th Cir. 1979)*,* ("an equitable doctrine should not be applied in a way that will frustrate the purpose of a federal statute"), *Sec. & Exch. Comm'n v. Gulf & W. Indus., Inc.,* 502 F. Supp. 343 (D.D.C. 1980) (Unclean hands may not be invoked against governmental agency engaged in enforcement actions.)

### B. <u>First Material Breach</u>

HMA alleges that Universal's claims are barred due to Universal's first material breach. ECF 118 at ¶ 145. This presumably relies on the same breach alleged in the counter-claim, and this defense must fail because HMA's counterclaim for breach fails, as discussed above. HMA also fails to identify the claims to which this defense applies—if

the defense survives, it should be limited to the contract claims in Counts IV and V of the Complaint. "In addition to pleading some facts tying the allegations in the complaint to the affirmative defenses asserted, a defendant must 'identify the [specific] claim to which [each] defense applies.'" *Daley v. Scott*, at *4 (M.D. Fla. June 28, 2016) quoting *Lee v. Habashy*, 2009 WL 3490858, at *4 (M.D. Fla. Oct. 27, 2009).

<u>Conclusion</u>

As there are no disputed issues of material fact for the claims discussed herein, Plaintiff is entitled to summary judgment as to liability regarding these claims.

WHEREFORE, Universal requests this honorable court grant partial summary judgment as to liability on the claims addressed herein.

Respectfully Submitted,

*s/ Nicholas A. Bader*
Nicholas A. Bader (FBN 55351)
Jason T. Allen (FBN 25659)
Andrew G. Thomas (FBN 1018226)
Jeremiah M. Hawkes (FBN 472270)
**BASS SOX MERCER**
2822 Remington Green Circle
Tallahassee, Florida 32308
T: 850.878.6404
F: 850.942.4869
nbader@bsm-law.com
jallen@bsm-law.com
athomas@bsm-law.com
jhawkes@bsm-law.com

*Attorneys for Plaintiff Action Nissan, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 11, 2023, the foregoing was served via email on all counsel of record.

/s/ Nicholas A. Bader
Nicholas A. Bader