**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ACTION NISSAN, INC. d/b/a UNIVERSAL HYUNDAI
for itself and in the name of the Department of Highway
Safety and Motor Vehicles of the State of Florida,
for its use and benefit,                                        Case No.: 6:21-cv-02152

               Plaintiff,

v.

HYUNDAI MOTOR AMERICA CORPORATION,

               Defendant.

_____/

<u>**PLAINTIFF'S MOTION FOR EQUITABLE RELIEF AND SANCTIONS**</u>

1

Plaintiff, Action Nissan Inc., d/b/a Universal Hyundai ("Universal"), files this motion seeking relief due to HMA's discovery misconduct and inconsistent positions.

## FACTUAL PREDICATE

In May of 2021 Universal was litigating with HMA over HMA's failure to comply with the terms of a previous settlement agreement between the parties. *Action Nissan, Inc. v. Hyundai Motor Am.*, 6:18-CV-380-WWB-EJK ("Genesis Litigation"). While Universal would eventually prevail in that case, at that time the case had been pending for over two years and would not be tried for months to come. Around this time, the Dealer-Principal for Universal, Bill Nero, realized that his inventory was proportionally (i.e., in terms of days' supply) significantly lower than other dealers. *See* DE 1-3.

On May 27, 2021, Universal, sent a letter to HMA detailing its significant inventory struggles. *Id*.  The letter alleged *inter alia* that HMA's retaliation was due to litigation between the parties. *Id.* The Dealer Sales and Service Agreement ("DSSA" at DE 1-1) between the parties requires that when vehicles are in short supply, HMA endeavor to "allocate the affected Hyundai Product(s) among its Dealers in a fair and equitable manner" and "provide DEALER with an explanation of the method used to distribute such products." *Id.* at 11. Furthermore, Florida law mandates HMA "shall maintain for 3 years records that describe its methods or formula of allocation and distribution of its motor vehicles" (§ 320.64(18) Fla. Stat. (2021)), in addition to requiring that HMA allocate its vehicles fairly, equitably, and in reasonable quantities. *See Id.,* §§ 320.64(19), (22) Fla. Stat. (2021). So, HMA had an obligation to have a fair and equitable system, to maintain records of how that system worked, and to explain to Universal how that system worked. Thus, the response to Universal's letter should have attempted to address the contentions

therein and explain how they were wrong and/or how HMA's allocation was fair and equitable. Instead, HMA has crafted an ever-shifting narrative where it has refused to commit to why vehicles were allocated or how the allocation process actually works.

## I.    Phase 1- HMA denies Vehicles are being withheld as Retaliation.

On June 14, 2021, HMA's Southern Region General Manager, Bob Kim ("Kiim"), responded to Universal, stating: "Universal Hyundai has not only received every vehicle to which it is entitled, it has received more than its fair share of any 'discretionary' allocation available for distribution by the Southern Region." *See* DE 1-4 ("Kim Letter"). The Kim Letter concluded: "I trust that this letter sets the record straight and causes you to reconsider and withdraw your **groundless accusations** against us." *Id.* (emphasis added).  The only reasonable way to interpret this is as a denial that vehicles were being withheld, at least in part, due to the litigation between Universal and HMA.

The pattern of deficient allocation continued, and Universal was highly dubious of HMA's claims that it was providing Universal "more than its fair share" of discretionary allocation. This case was filed December 23, 2021. DE 1. In its February 11, 2022 Answer, HMA doubled down on the claims in the Kim Letter, not only generally denying any of its actions were retaliatory, but specifically averring "that HMA advised Plaintiff in HMA's June 14, 2021 letter that Plaintiff had received every new Hyundai vehicle to which Plaintiff was entitled under HMA's allocation system and that Plaintiff also received more than its fair share of 'discretionary' allocation of new Hyundai vehicles." DE 18 at ¶ 46.

Shortly thereafter, Universal sent interrogatories to HMA. On May 23, 2022, HMA responded. *See* DE 138-9. HMA was asked to identify "all rules, standards, policies, and methodologies used by GMA/HMA for the allocation of vehicles..." to which it responded

3

it was providing two documents, neither of which discuss how discretionary allocation works. *See Id.* at 3-4; DE 119-5; DE 128-11. HMA was asked to identify individuals involved in the creation or enforcement of those same methods or policies of allocation. DE 138-9 at 4-5. HMA identified Kim as having "final authorization" and stated he "determines…discretionary allocation volumes in the Region." *Id.*

HMA was also asked to identify the factual basis for "stating that Universal has received 'not only every vehicle to which it is entitled, [but also] more than its fair share of any 'discretionary' allocation' in the June 14, 2021 letter to Universal Hyundai from HMA." DE 138-9 at 8. HMA responded "[t]he factual basis for the quoted statement from the June 14, 2021 letter is set forth in the letter itself. In addition, Defendants are producing, in response to Plaintiff's Request No. 2 for Production of Documents, the Regional allocation records from which Plaintiff can verify that factual basis for itself." *Id.* However, those records only show vehicles that were allocated, not why they were allocated. *See* DE 138-10 at 5-6 (noting raw data as to allocation numbers would be produced).

At this point in May 2022, this appeared to be a straightforward dispute. Universal claimed it was not receiving its fair share of allocation and HMA was withholding vehicles due to the Genesis Litigation. HMA claimed no allocation was being withheld and Universal was receiving "more than its fair share."

## II.   **Phase 2- HMA acknowledges it Withholds Allocation based on Litigation…in a Separate Case**

Before this action was filed, HMA sued a different Hyundai dealer in Florida, West Palm Beach Hyundai ("WPB"). *Hyundai Motor Am. Corp. v. EFN W. Palm Motor Sales, LLC*, 20-CV-82102 in the Southern District of Florida. ("WPB Litigation"). HMA accused WPB and some of its employees of RICO, fraud, and conspiracy. 20-cv-82102 DE 144.

On July 8, 2022, WPB filed a counterclaim alleging that beginning "in the second half of 2021" HMA was withholding allocation from them. 20-cv-82102 DE 318 at ¶¶ 22-35. On July 27, 2022, HMA filed an answer containing an affirmative defense stating:

> West Palm's claims for damages relating to alleged failures of HMA to properly allocate vehicles are barred and/or estopped because HMA has discretion as to a portion of the vehicles that it allocates to its dealers. HMA makes these discretionary allocations based on whether or not each dealer has acted as a good partner to HMA. This analysis includes consideration of a number of factors, including, but not limited to, whether the dealer has participated in Hyundai programs such as an HDAA, invested in the brand, including facilities, and **whether the dealer is involved in litigation with HMA and the nature of any such litigation**. DE 128-16 at Affirmative Defense 10. (Emphasis added).

In the WPB case, HMA represented to the Court that it considers "whether the dealer is involved in litigation with HMA."  In this matter, despite discovery seeking HMA's methodology and rationale for allocations decisions, HMA had not disclosed these three "good partners" factors, or any factors. Notably, Universal satisfies two of the three factors HMA identified in the WPB case. On June 22, 2023, Kim, who had final authorization of discretionary allocation decisions, testified that HMA "never used the HDAA…as a reason to say no to the allocation" because Universal participates in an HDAA. *See* Kim Dep. at 245:16-23, Ex. 1. Universal had also "commenced" (using HMA's term) upgrading its facilities—making litigation the only factor that could count against Universal. DE 128-22.

Testimony in the WPB trial further reinforced that HMA withholds vehicles from dealers involved in litigation with HMA.  On January 11, John Fratianni, South Florida District Sales Manager for HMA was asked during the WPB trial:

> Q. Mr. Kim instructed you not to give West Palm any discretionary vehicles because Hyundai is involved in a lawsuit with them; is that right?
> A. No. He instructed me that **we are not allowed to provide additional supplemental vehicles to dealers that are involved in litigation with Hyundai**.

January 11, 2023 Trial Transcript 9:20-cv-82102-WM, Fratianni Testimony, Ex. 2 at 9. (Emphasis added).

During the same trial on January 13, Kim, the person with decision-making authority for allocation in the Southern Region (and who wrote Universal and instructed Mr. Fratianni), testified on behalf of HMA. He was asked what factors he used to allocate vehicles out of the discretionary pool and replied:

> From a strategic perspective, we would want to grow and maximize our sales volume, our performance.
> To do that we really spent a lot of time focusing on actions that would increase the sales velocity, so speed up the time from the time it landed at a dealership to the time it gets retailed, and looking at the days supply both on the ground as well as in the pipeline. So, we would focus on the dealers who performed well in those areas, and we'd use a portion of that discretionary pool to support.
> Additionally, we would factor in other things, such as, if we had specific programs or initiatives that the company was working towards, and those dealers that participated in that, we would tend to support those dealers more.
> If we had different market actions where we were tactically looking at a specific market to grow, often they'd participate in what we call an HDAA, which is a Hyundai dealer advertising association. So, if they participated in those, we would support those. And **we also look at if we were in litigation with a dealer, that would be something we would kind of consider as well before we would make decisions to allocate or not**.

January 13, 2023 Trial Transcript 9:20-cv-82102-WM, Kim Trial Testimony, Ex. 3 at 7-8. (Emphasis added).

On cross, Kim admitted that Universal did not receive allocation due to litigation:

Q. **Another dealer that didn't get discretionary allocation was Universal Hyundai, right?**
A. **I don't recall them getting any**.

Q. That is because they were in litigation with Hyundai, right?
A. One of the factors of whether we would or wouldn't is definitely whether the dealer is in litigation with our company.

**Q.** And Universal also was not told it was not getting discretionary allocation, right?
A. Correct**.**

Q. Universal Hyundai sued Hyundai and got a multimillion-dollar judgment against Hyundai, right?
A. I don't know if -- I don't know.

Q. Let's go to the [Kim Deposition] transcript, 113 to 119.
    "Question: Now, Universal Hyundai was a dealer that had been in litigation with Hyundai, correct?
    "Answer: Yes.
    "Question: Did Universal Hyundai actually receive a money judgment against Hyundai? [Overruled objection omitted]
Q. "Answer: I don't ever -- I didn't -- I never see like the final outcome, but it was my understanding that there was some type of financial award, but I don't know if it ever really happened or not. I don't know." Do you recall that testimony?
A. Yes.
January 13, 2023 Trial Transcript 9:20-cv-82102-WM, Kim Testimony (cross), Ex. 4 at 9-10.

In the Rule 50 argument, when HMA's counsel was asked about not telling the dealers it was withholding vehicles due to litigation, it argued that was in line with the contract: "We chose instead to take a different tactic, which is, if you are not going to comply with the contract, I am not going to give you additional vehicles that I can give to a dealer who is complying with the contract." January 17, 2023 Trial Transcript 9:20-cv-82102-WM, Rule 50 Motions, Ex. 5 at 11. HMA took the position that withholding vehicles was justified to punish dealers who failed to comply with the contract (and prevailed).

**III.    Phase III-HMA Starts to Change its Story in this Case**

On January 1, 2023 HMA produced an email from Rob Grafton, HMA's Director of Dealer Development & Strategy (dated April 19, 2022), claiming it is problematic and inconsistent to provide allocation to dealers in litigation. Ex. 6, D_00337-339 (Robert Grafton April 19, 2022 email.) Grafton forwards the response to the regional general managers, including Kim. *Id.*

7

This was the first time in discovery that HMA disclosed anything indicating that litigation and/or facilities were grounds for withholding allocation, and HMA had still not disclosed that fact in its interrogatory answers. This email, from a senior executive, shows that litigation was a concern at the highest levels of HMA.

On February 6, 2023, *after* the disclosure of the Grafton email and the WPB trial, HMA continued to "hide the ball" regarding whether it withheld allocation from Universal based on litigation. Universal sent a Second Set of Interrogatories and asked HMA to "[e]xplain any actions Defendants took against Universal in regards to the 2018 lawsuit." HMA responded:

> The only action that Defendants took "against" Universal in regards to the 2018 lawsuit was to defend against Universal's allegations, and the only action either Defendant took "against" Universal in regards to the resulting judgment against HMA was to file post-trial motions to set aside the judgment and to file and brief an appeal of the judgment. Defendants have not taken any action against Universal with respect to limiting allocation to Universal under Defendants' formulaic allocation system, participation in incentive programs, opportunities to participate on Dealer advisory boards, or advertising programs. With respect to discretionary allocation of new vehicles, Defendants have applied the same factors to Plaintiff as it applies to all dealers. DE 52-3 at 9.

This evasive response avoids any direct explanation of the factors HMA applies to manual or discretionary allocation despite contractual, statutory, and discovery obligations to explain such. The response also fails to state that HMA withheld discretionary allocation from Universal, despite admitting as much under oath in the WPB trial a month before. Read in conjunction with the testimony and filings from the WPB Litigation, it clear that HMA was intentionally avoiding an admission in *this case* that HMA withheld allocation based on the litigation, despite testimony to that effect in the WPB

Litigation. In any event, HMA's response is still a marked departure from HMA's prior claim that Universal was receiving "more than its fair share" of allocation.

Universal asked HMA to explain any determinations made with respect to Universal regarding the three factors identified in the WPB Litigation. DE 52-3 at 4-5. HMA objected and refused to do so, claiming it did not understand what "good partners" means despite it being a phrase HMA introduced. *Id.*; DE 128-16. Universal also asked HMA to identify changes in its policies or practices regarding allocation during the relevant time period. *Id.* at 6-8. HMA did not mention anything about discretionary allocation factors. *Id.*

On April 14, 2023, Tim Turbyfield, the regional sales manager for the Southern Region during the relevant time period, testified that a directive came from HMA national executives that some dealers were not eligible for discretionary allocation. DE 128-18, Tim Turbyfield Depo. 71:23-72:15. He also testified Universal was on that list due to litigation. *Id.* at 75:2-13, 75:25-76:11.

As discrepancies between HMA's document production, witness testimony and written discovery responses piled up, Universal sent Requests for Admissions dated March 27, 2023 in hopes of clarifying facts and narrowing triable issues. Universal asked HMA to admit, *inter alia*, whether HMA: i) makes discretionary allocation in part based on whether a dealer is currently involved in litigation with HMA, ii) makes discretionary allocation in part based on whether a dealer has been involved in litigation with HMA in the past, iii) does not explain to dealers how litigation against HMA may affect their allocation, iv) does not consider Universal Hyundai to be a good partner, in whole or in part, because of the prior and current litigation between the parties, v) has deprived or limited discretionary allocation to Plaintiff based on Plaintiff's prior litigation against HMA,

vi) has deprived or limited discretionary allocation to Plaintiff based on Plaintiff's current litigation against HMA. On April 26, 2023, HMA responded "Denied as phrased" to every request. Ex. 7, HMA Response to RFAs. However, at the time of these responses HMA was aware that at least some of these requests *should have been admitted* based on facts disclosed in the WPB Litigation and HMA's document production which predated HMA's responses. *See, e.g.* DE 128-24 (2022 emails and spreadsheets showing Universal was zeroed out of allocation based on litigation); Ex. 6 (April 2022 email); Ex. 4 (January 2023 Kim testimony that Universal received no discretionary allocation due to litigation and was not informed of the fact). But HMA continued to feed Universal with discovery responses which were misleading or blatantly refuted by underlying facts of the case in an attempt to confuse issues and thwart Universal's claims.

IV.     **Phase 4- HMA Provides *New* Factors.**

On May 8, 2023, after an Order (DE 79 at 2), HMA provided supplemental discovery responses which identified for the first time ten factors purportedly used for discretionary allocation (not the three factors HMA relied on in the WPB Litigation):

> Specifically, in determining whether, and how to, allocate discretionary units throughout the Southern Region, HMA's regional management considers: (1) how to maximize the amount of allocation that will be given to the Southern Region; (2) how to grow and maximize the Southern Region's sales volume and performance; (3) increasing sales velocity; (4) each dealer's sales performance, "balanced day supply" of vehicles, their pipeline days supply, sales velocity, and the number of vehicles needed to bring dealers up to a certain level of inventory; (5) whether HMA had specific programs or initiatives that the company was working towards; (6) whether a dealer participates in HMA sponsored programs or initiatives, including but not limited to those intended to increase a dealer's new vehicle sales and awareness of the Hyundai brand in the market; (7) whether a dealer is in litigation with HMA and the nature of that litigation; (8) whether a dealer participates in a Hyundai Dealer Advertising Association ("HDAA"); (9) the available mix of vehicle models in the discretionary pool; and (10) whether

there is a specific tactical market action HMA wants to support in an effort to strategically grow sales in that area. DE 87-1 at 2-4.

This supplemental answer blatantly contradicts HMA's April 23rd Request for Admissions responses. For example, RFA #3 and 4 asked whether HMA makes discretionary allocation decisions based on litigation, and HMA denied both. Despite the denials, factor #7 is "whether a dealer is in litigation with HMA." Ex. 7 (also compare: RFA #1 to factors #6 and 8, RFA #11 to Initial and Supplemental Responses to Interrogatory 3.)  HMA now relies upon on these contradictory written responses in its Motion to Exclude Stockton (DE 120 at 5) and its summary judgment briefing (DE 127 at 7,8, 20).

Similarly, in February 2023 HMA denied that there were adverse consequences to allocation based on litigation and "[w]ith respect to discretionary allocation of new vehicles, Defendants have applied the same factors to Plaintiff as it applies to all dealers". DE 52-3 at 9. However, HMA's compelled interrogatory responses in May 2023 stated:

> HMA has taken no adverse action specifically directed towards Universal in response to the present lawsuit, the 2018 lawsuit, or the resulting judgment against HMA. Instead, in or about February 2022, HMA's National Dealer Development team discussed with HMA regional managers its concerns about providing discretionary allocation to dealers that were engaged in litigation with HMA. Based on these discussions, whether a dealer was in litigation with HMA was a factor considered by the Southern Region in allocating discretionary vehicles from approximately February 2022 through April 2022. DE 87-1 at 4-5.

These responses, provided just before the close of discovery and after expert deadlines lapsed, were the first acknowledgement that HMA withheld vehicles based on litigation. Up to this point HMA's entire defense had been that it did not withhold vehicles based on litigation. Only after this Court compelled discovery responses did HMA acknowledge it withheld vehicles due to litigation, which it had known all along (and even admitted in open court in the January 2023 WPB trial). *See* Ex. 4 at 9-10.

HMA's May 2023 supplemental responses also purportedly limited the use of litigation as a factor to a three-month time period—February of 2022 through April 2022. DE 87-1 at 4-5. The allegation in the WPB Litigation, however, was that HMA had withheld allocation from that Dealer since Q2 2021. Ex. 8 at counterclaim ¶¶25-35, WPB Counterclaim. HMA responded that it withheld based on litigation (DE 128-16 at 17), and neither in its answer nor trial testimony was there any temporal limitation put on the litigation factor (the trial occurred in January of 2023, and there was still no temporal limitation mentioned). *See Id.*; Ex. 2-4. HMA has also failed to produce any documents related to the alleged February 2022 meeting, despite such information being requested by Universal. *See* DE 52-3 at 4 (interrogatory no. 1); DE 52-4 at 7-8, 13 (request nos. 10, 27). If this 2022 meeting resulted in changes, after filing this action, and it impacted Universal, HMA should have maintained records to comply with statutory and contractual obligations, as well as HMA's obligation to preserve documents under a litigation hold.

## V.    HMA Factors Cannot be Verified

HMA witnesses also consistently contradicted written discovery responses, indicating that HMA is providing misleading information to prevent Universal from properly narrowing the issues in this case and/or understanding the true nature of HMA's defenses. For example, on June 21, 2023 Mr. Parker, HMA's CEO, testified that the national office started to encourage a more "disciplined" approach to allocation with the start of the chip shortage and encouraged regions to only provide manual allocation to dealers "partnering with us". Parker Dep. at 58:1-59:5, 76:12-77:4, Ex. 9. Parker testified HMA does not "consider the nature of the litigation when it comes to any consideration as it pertains to discretionary allocation", stating "litigation is litigation". *Id.* at 84:1-85:12.

He also acknowledged there were no obligations to provide allocation under HMA's facility programs, contradicting HMA's discovery responses. *Id.* at 86:4-88:5; DE 119-6 at 3.

On June 27, 2023, Kim testified as a corporate representative for HMA. When asked about HMA's consideration of litigation (factor 7) he was not able to narrow down the time period that litigation was a consideration.  Kim testified that litigation was a consideration for the three months listed in the supplemental response, but then it stopped being a consideration, and then at some unspecified point in time prior to the July 2022 WPB answer it was a consideration again, and litigation is still a factor now. Kim also was unable to clearly identify any type, or nature, of litigation dealers could engage in without adverse effects. *See* Ex. 10 Kim 30(b)(6) p. 126:12-130:23.

On July 13, 2023 HMA, in response to a second order compelling it [DE 104], provided written discovery answers explaining why specific dealers received discretionary allocation, as well as how much they received, for six months. DE 119-6. The answers HMA provided do not match the 10 factors HMA now purports to rely upon. For example, for October 2021, part of HMA's explanation as to why Universal received zero discretionary units was "Universal sent a letter to HMA reiterating its desire to withdrawal (sic.) from the Central Florida HDAA." *Id.* at 4. But Universal never left the HDAA, and HMA's corporate representative testified weeks earlier that because Universal never left, it did not have any negative impact on allocation. Ex. 10, Kim 30(b)(6) Dep. at 65:12-66:1.

For January 2022, part of HMA's rationale for Universal receiving zero discretionary units was "in December 2021, Universal communicated its desire to opt-out of the Ioniq E Vehicle Program." That communication occurred on December 19, 2021, and was rescinded less than two weeks later on December 31, with Universal committing

to the program *before* January allocations took place. Ex. 11, PLT 003686, IONIQ Email.

Again, HMA's written discovery response does not align with the facts or its previous

written interrogatory answers. *See* Ex. 7 at 1-2 (HMA denied basing discretionary

allocation on program participation). Universal also received zero discretionary units in

February 2022 and May 2022. HMA provided an identical explanation for both months:

> No discretionary units were allocated due, in part, to legal action taken by
> Universal against HMA. Specifically, this lawsuit.
> Additionally, based on Mr. Kim and Mr. Turbyfield's review of the relevant
> data and application of the relevant factors identified in Interrogatory No. 3,
> they exercised their business judgment and determined that the Hyundai
> brand would be most benefited if the discretionary units were provided to
> other dealers within the region. While Universal's days' supply may have
> been at or below the region average when the discretionary allocations were
> run, Universal's historic inventory levels and sales rates did not justify
> additional units at this time. DE 119-6 at 5.

However, "historic inventory levels and sales rates" are not a factor HMA

references. DE 87-1 at 3-4. The reality is all dealers had lower inventory and available

evidence indicates that Universal had a better sales velocity than most dealers. *See* DE

128-9 (Charts from Stockton's Report showing Universal's sales rate); Ex. 10, Kim

30(b)(6) Dep. at 64:8-20 (stating Universal's sales velocity was "in line with the region.")

More notably, May of 2022 is *outside of the three months* HMA previously stated that the

litigation factor was limited to. DE 87-1 at 4-5 (stating litigation factor was applied

"approximately February 2022 through April 2022.")

On July 20, 2023, Turbyfield testified that factor 4 (dealer

performance/inventory/sales velocity) was the "primary factor" the region considered for

discretionary allocation. Ex. 12, Turbyfield Dep. at 183:21-184:5. Turbyfield further

testified that the litigation factor was directed by HMA's "executive management", not the

region. *Id.* at 181:9-182:17. He also testified, contrary to the compelled interrogatory

answer, that Universal, along with other dealers, was zeroed out of allocation in May of 2022 **because of litigation**, not based on any other factor. *Id.* at 189:8-190:12.

## **LEGAL ARGUMENT**

### I.    **HMA Failure to Comply with the Statute Shifts the Burden of Proof**

Section 320.64(18) Fla. Stat. obligates HMA to "maintain for 3 years records that describe its methods or formula of allocation and distribution of its motor vehicles and records of its actual allocation and distribution of motor vehicles." HMA has no records that describe its methods for discretionary allocation. The only record evidence on *how or why* discretionary allocation is distributed is testimony from HMA employees and written interrogatory responses, which are inconsistent and contradictory. HMA, in summary judgment briefing, claims that its "policy" is in one of its manuals, but that singular page only requires that HMA properly record reason codes for manual allocation and does not explain HMA's methodology or any formula used. DE 139 at 6. Even the limited records HMA kept of reason codes, which supposedly note the reason why certain manual allocation was distributed to certain dealers, are useless. Kim testified that those reason codes were often entered incorrectly because HMA had "brand new analysts that was just punching things didn't know what the codes were", noting for a period of time "a hundred percent of our southern region was in general discretionary." DE 144-3, Kim Dep. at 151:10-152:20, 153:3-158:16; *see also* ECF 128-13.:

Section 320.64(18) Fla. Stat. does not provide for a precise remedy when a manufacturer fails to keep the required records. However, in other similar instances, courts have provided a presumption against the party failing to keep required records. In an FLSA context, Courts have provided for a presumption against employers who do not keep time records they are legally required to keep. This rule was created in *Anderson v.*

*Mt. Clemens Pottery Co*., 328 U.S. 680, 686-687 (1946), which held that even though the employee had the normal burden of proof to show they were not compensated for hours worked, "[d]ue regard must be given to the fact that it is the employer who has the duty under s 11(c) of the Act to keep proper records".  Thus, the burden of proof shifts to the employer "where the employer's records are inaccurate or inadequate." Part of the court's reasoning centered on the remedial nature of FLSA. *Id.*  The Eleventh Circuit recently applied this burden shifting where an employer attempted to deduct meal breaks from employee paychecks but failed to keep records of the employee time. *See Gelber v. Akal Sec., Inc.,* 14 F.4th 1279, 1283 (11th Cir. 2021). The same reasoning has been applied in ERISA cases as well. *Combs v. King*, 764 F.2d 818, 827 (11th Cir. 1985).

Another helpful example is "in an action for an accounting against a trustee, 'if the trustee fails to keep clear, distinct, and accurate accounts, all presumptions are against him and all obscurities and doubts are to be taken adversely to him'" *Cassedy v. Alland Investments Corp*., 128 So. 3d 976, 978 (Fla. 1st DCA 2014) quoting *Traub v. Traub,* 135 So.2d 243, 244 (Fla. 2d DCA 1961).

In a tort setting, the Florida Supreme Court has ruled that a burden shift from plaintiff to defendant is appropriate when "essential records are found to be either missing or inadequate through the defendant's negligence" and the "absence of the records hinders [Plaintiff's] ability to establish a prima facie case." *Pub. Health Tr. of Dade Cnty. v. Valcin*, 507 So. 2d 596, 599 (Fla. 1987). The Court made clear it was concerned with the "fairness" of the proceedings. *Id.*

A similar burden shift is appropriate in this case. HMA's lack of records on the methodology of its discretionary allocation has enabled HMA to create post facto

justifications for its allocation practices. Like the FLSA, the Florida Dealer Protection Act is remedial. *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of N. Am., Inc.*, 32 F.3d 528 at n. 3, (11th Cir. 1994). Universal brings claims under Section 320.697 Fla. Stat., which provides "[u]pon a prima facie showing by the person bringing the action that such a violation by the licensee has occurred, the burden of proof shall then be upon the licensee to prove that such violation or unfair practice did not occur." If the Court finds that Universal did not prove a prima facie case, it should shift the burden of proof to HMA to preserve the fairness of these proceedings.

## II. HMA should be Judicially Estopped from Claiming it did not limit Universal's Allocation due to Litigation

The Court should apply the equitable remedy of judicial estoppel in this case, which serves to preserve the integrity of the judicial process. "The doctrine prevents parties from making a mockery of justice by inconsistent pleadings, and playing fast and loose with the courts." *Blumberg v. USAA Cas. Ins. Co.*, 790 So. 2d 1061, 1066 (Fla. 2001) (Internal citations omitted). "In diversity cases, 'the application of the doctrine of judicial estoppel is governed by state law.'" *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, fn. 7 (11th Cir. 2018). There are four elements to judicial estoppel in Florida:

> [1] A claim or position successfully maintained in a former action or judicial proceeding [2] bars a party from making a completely inconsistent claim or taking a clearly conflicting position in a subsequent action or judicial proceeding, [3] to the prejudice of the adverse party, [4] where the parties are the same in both actions, subject to the "special fairness and policy considerations" exception to the mutuality of parties requirement.

*Whittingham v. HSBC Bank USA, NA as Tr. for Holders of Deutsche Alt-A Sec. Mortgage Loan Tr., Series 2007-OA1,* 275 So. 3d 850 (Fla. 5th DCA 2019).

HMA took a position on allocation in the WPB Litigation—that it could withhold allocation due to litigation to force compliance by dealers. Ex. 5 at 11. HMA prevailed on

those allocation claims after a trial held this January. HMA has since changed its position, now claiming HMA did not consider litigation at all for discretionary allocation, or alternatively that it only considered litigation for a few months. The Court must not allow HMA to take such inconsistent positions on the same issue between these matters.

A.  The WPB Litigation is a Former Judicial Proceeding

The WPB Litigation has been fully tried. A "favorable jury verdict satisfies the requirement that the party successfully maintain the action in the first suit." *Blumberg v. USAA Cas. Ins. Co.*, 790 So. 2d 1061, 1067 (Fla. 2001). HMA was a party, represented by the same lead counsel on the allocation counterclaims as in this case. The WPB litigation was tried on the same statutes and contract, regarding a nearly identical time frame. The WPB Litigation claims started in July 2021, Nero sent his letter in May 2021. *See* Ex. 8; DE 1-3. In this matter, Mr. Turbyfield testified in April 2023 that the direction to consider litigation came down sometime 2022 and was lifted in Q3 2022, while Kim, as a corporate representative, claimed litigation was always considered but was scrutinized more starting around April or May 2021. Turbyfield Dep. at 43:20-49:14, Ex. 13; Kim 30(b)(6) Dep. at 53:8-54:14, Ex. 10. HMA's Southern Region General Manager, Kim, has been identified as the individual making final allocation decisions for both cases. In the WPB Litigation, HMA claimed it considered whether "the dealer is involved in litigation with HMA and the nature of any such litigation" in making discretionary allocation decisions. Kim testified to that affect. HMA prevailed on the allocation claims.

B.  HMA is making a completely inconsistent claim

In the WPB Litigation, HMA adopted and identified three factors: "whether the dealer has participated in Hyundai programs such as an HDAA, invested in the brand,

including facilities, and whether the dealer is involved in litigation with HMA and the nature of any such litigation." *See* HMA WPB Litigation Answer, DE 128-16. Kim testified at trial to essentially these same factors, only adding sales velocity (how fast vehicles are sold). *See* Ex. 3 (highlighted section). Kim's trial testimony is similar to the ten-factor test, but without temporal limitations on the litigation factor. *Compare Id.* with DE 87-1 at 3-4.

Kim also testified that vehicles were withheld from Universal due to litigation and furthermore, the vehicles were withheld due to the litigation where Universal received a favorable verdict (*i.e.*, the Genesis Litigation, not the instant litigation). Ex. 4 (highlighted portion). This is inconsistent with HMA's initial position in this case, that Universal received "more than its fair share of discretionary vehicles" and that Universal's allegations of retaliation were "groundless." DE 1-4 at 2. The only factor that really seems to materially impact allocation decisions concerning is the litigation factor. Kim's trial testimony (provided on January 13, 2023) is inconsistent with the Supplemental Answers to the Second Set of Interrogatories #6 (provided on June 13, 2023) where HMA contends the litigation factor only applied for February, March and April of 2022 and only was applied because of the current lawsuit not the Genesis Litigation. Kim testified that the case he withheld allocation based on had been resolved with a money judgment (i.e., the Genesis Litigation), not this case. Ex. 4 (highlighted portion). This is clearly inconsistent. Courts do not allow for this sort of gamesmanship. For instance, in *Keyes Co. v. Bankers Real Estate Partners, Inc.*, 881 So. 2d 605 (Fla. 3d DCA 2004) the plaintiff, Keyes, was a real estate broker and the defendant, Bankers, was another realtor. During the pendency of a lawsuit regarding whether commission was due, Bankers represented it had an agreement to split the commission with Keyes who was not a party to the matter. Later,

Bankers refused Keyes its split of the commission and Keyes sued. The Court ruled "[h]aving previously argued [in prior litigation] that Keyes was entitled to half of the commission, Bankers cannot now counter-argue that Keyes waived their right to their half of the commission." *Id.* at 606. The same is true here, HMA provided testimony that it withheld allocation due to litigation from Universal, it cannot now say it did not.

### C. The Inconsistency Prejudices Universal

Universal began this action alleging that HMA was retaliating against it for seeking to vindicate its legal rights. In the WPB litigation, HMA openly acknowledged it was retaliating against Universal by reducing its allocation due to litigation between the parties. In the instant litigation, HMA attempts to walk this admission back, given the obvious unfairness of trying to punish Universal for seeking legal redress for a case it actually won. "Prejudice 'occurs when 'the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Whittingham* 275 So. 3d at 853 (Fla. 5th DCA 2019) *quoting Salazar-Abreu v. Walt Disney Parks & Resorts U.S., Inc.*, 277 So. 3d 629 at n.2 (Fla. 5th DCA 2018).

### D. Fairness and Policy Considerations require Judicial Estoppel be Applied

In *Blumberg* the Florida Supreme Court held while "judicial estoppel normally requires mutuality of parties, there are exceptions to this requirement." *Blumberg* 790 So. 2d at 1067. Mutuality of parties between this case and the WPB Litigation may be lacking, but HMA is a party to both and each case involves a Hyundai dealership. The *Blumberg* Court ruled "special fairness and policy considerations" could compel exceptions to the mutuality of the parties requirement, the same as they do for the res judicata or collateral estoppel doctrines. *Id.* There is limited authority on this exception, but one court explained

20

"special fairness and policy considerations" exist when a party uses "intentional self-contradiction to obtain an unfair advantage in litigation." *Grau v. Provident Life & Acc. Ins. Co.*, 899 So. 2d 396, 401 (Fla. 4th DCA 2005). That is exactly what has occurred here.

The WPB Litigation involved allocation claims under the very same Dealer Act provisions raised by Universal, regarding same decision makers at HMA, and the same HMA policy of withholding allocation based on litigation. If that were not enough, Kim testified at the WPB Litigation trial (and in a deposition in that matter), that HMA withheld vehicles from Universal due to litigation. In *Blumberg* the court allowed an insurance agent to claim judicial estoppel when the plaintiff first sued the insurance company and then sued him under inconsistent theories. In *Keyes,* the court allowed the plaintiff to claim judicial estoppel when the defendant alleged it was entitled to the whole commission when in prior litigation (which the plaintiff was not a part of) it testified the plaintiff was only entitled to half. In *Town of Oakland v. Mercer*, 851 So. 2d 266 (Fla. 5th DCA 2003), the court ruled the Town was judicially estopped from arguing Mercer did not have standing to challenge a forfeiture when it had argued in another proceeding a separate individual did not have standing and only Mercer did. In each of these cases, as here, estoppel was applied when the party who was estopped had been engaged in litigation with a third-party, took a position in the third-party litigation regarding the non-estopped party, and abandoned the position in litigation with the non-estopped party.

The same principle should apply here. HMA witnesses testified that vehicles were withheld from Universal due to the Genesis Litigation in the 2021-2022 timeframe and there was a consistent policy of withholding allocation due to litigation. Now, HMA wants

to argue there was only a temporary policy and it only applied to this current litigation. The Court should apply Judicial Estoppel in this case and estop HMA from arguing:

- it did not withhold vehicles from Universal due to litigation;

- vehicles were withheld only as a result of the instant litigation, when HMA testified in a prior trial that vehicles were withheld due to the Genesis litigation;

- the litigation factor was only applied for a 3-month time period, when it testified in a prior trial (after this three-month time period) that it withheld cars due to litigation without placing any temporal restriction on its testimony; and

- it considered factors or conditions it did not assert in the WPB litigation.

Instead, there should be a positive, non-rebuttable finding that from at least April 2021 through the end of Kim's tenure as Regional General Manager in August 2022 that HMA was withholding discretionary allocation from Universal due to litigation. The date is based on Parker's testimony that National starting seeking more discipline from the regions when the microchip shortage started, and Kim's testimony that the chip shortage started in March or April of 2021. Parker Dep. at 58:1-59:5, 82:20-86:3, Ex. 9; Kim Dep. at 52:7-24, June 22, 2023, Ex. 1. It also aligns with the May 27, 2021 Nero letter and the WPB Litigation allegation's that HMA was withholding cars starting in July 2021. DE 1-3. HMA took a contrary position taken in this case, namely that the litigation factor only applied for three months, from February-April 2022. DE 87-1 at 4-5. HMA cited the Supplemental Responses both in its Motion for Summary Judgement and its Motion to Exclude. See DE 127 at 2-3, 18-21, DE 120 at pp. 6, 23-24. HMA should also be estopped from arguing factors and conditions it did not assert in the WPB litigation.

  **III.**  **HMA Should be Sanctioned for failure to Comply with Discovery Rules**

"A court may impose sanctions for litigation misconduct under its inherent power." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc*., 561 F.3d 1298, 1306 (11th Cir. 2009). "The key to unlocking a court's inherent power is a finding of bad faith… A party demonstrates bad faith by, *inter alia*, delaying or disrupting the litigation or hampering enforcement of a court order." *Id.*  "[T]he inherent power of a court [to sanction] can be invoked even if procedural rules exist which sanction the same conduct." *Hornady v. Outokumpu Stainless USA*, 572 F. Supp. 3d 1162, 1185 (S.D. Ala. 2021), reconsideration denied, 2022 WL 5052293 (S.D. Ala. Oct. 4, 2022) quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991). "Bad faith exists when the court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, or where a party or attorney knowingly or recklessly raises a frivolous argument." *Id.* (Internal quotations omitted.) "[S]everal federal courts have held that the need for sanctions is heightened when the misconduct relates to the pivotal or 'linchpin' issue in the case." *People for the Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*, 2020 WL 13614406, at *4 (M.D. Fla. Feb. 26, 2020), judgment entered sub nom. 2020 WL 13614398 (M.D. Fla. Mar. 23, 2020)(Internal quotations omitted). The methods and practices of HMA relating to allocation of vehicles is a linchpin issue in this case.

In addition to the Court's inherent sanction power, Rule 26(g)(3) authorizes the court to impose sanctions when an attorney certifies discovery responses and the "certification violates this rule without substantial justification" Rule 37(b)(2)(A) provides "[i]f a party …fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders… **including rendering a default judgment** against the disobedient party."

Under Rule 37, "[a] default judgment sanction requires a willful or bad faith failure to obey a discovery order." *Holland v. Westside Sportsbar & Lounge, Inc.*, 2020 WL 7390723, at *3 (M.D. Fla. Aug. 11, 2020), report and recommendation adopted, 2020 WL 7390581 (M.D. Fla. Sept. 3, 2020).

HMA, in its Motion for Summary Judgment, now tries to leverage its own failure to provide fulsome discovery against Universal by arguing that Universal cannot present evidence regarding the equities of other motor vehicle dealers. See DE 127 at 2-3, 18-21. Notably, Universal did request information relating to the "equities" of other dealers, but HMA refused to provide that information. *See* DE 138 at 15. It does the same thing in its Motion to Exclude citing the 10 factors from its supplemental second interrogatory responses and arguing that Universal's expert could not explain where the extra cars should come from. See DE 120 at pp. 6, 23-24.

The numerous contradictory responses to written discovery in this case violate Rule 26(g). HMA denied almost every request for admission propounded on it, only to later provide interrogatory responses which are tantamount to admissions–and HMA knew the requests for admission to be true at the time of its denials. HMA's interrogatory answers are also patently evasive and there is nothing in the supplemental answers that HMA was not aware of earlier. HMA could have, and should have, provided the information in its supplemental responses at an earlier time as Rule 26 requires supplementations be made in a "timely manner" to correct responses. For instance, Kim testified in the WPB Litigation about the factors in January 2023. HMA did not supplement its responses in this litigation to match that testimony. Instead, HMA had to be compelled more than three months after Kim's testimony, on April 28, 2023 "to identify the factors

that it used to determine the discretionary allocation of vehicles to Plaintiff." DE 79. On May 8, HMA responded, but then tried to limit the litigation factor to three months, which it subsequently contradicted in a supplemental response to a different interrogatory, without supplementing the compelled answers. DE 87-1 at 5.

On June 26, 2023, HMA was compelled to "specifically answer Interrogatories 3 and 9 of Plaintiff's Second Set of Interrogatories" in regards to six discrete months selected by Universal. DE 104. This was the second time the Court ordered HMA to supplement its deficient responses to interrogatory nos. 3 and 9. *See* DE 79 at 2.

Even though HMA only had to provide information for six months, HMA gave vague, minimal effort answers that did not really explain anything, and also contradicted its previous responses to other discovery requests (which they did not supplement.). HMA's compelled responses relied in part on the 10 factors, but also pointed to other previously undisclosed reasons for the withheld inventory. Furthermore, after the Court compelled these discovery responses, HMA's witnesses continued to give answers at deposition which contradict the existence or application of HMA's factors, demonstrating HMA's continued lack of candor in discovery. *See* Harriman 30(b)(6) Dep. at 12:6-13:3, 13:4-8, 16:3-5 (DE 128-12) (denying HMA directed regions to withhold allocation based on litigation, denying the existence of allocation policies tied to HDAAs, denying the existence of policies relating to facility programs); DePaul Dep. at 92:21-93:18, 94:2-24 (DE 128-17) (denying any obligations to provide allocation under GDSI 2.0, denying the existence of the 10 factors); Turbyfield Dep. at 71:23-72:15, April 14, 2023 (DE 128-18) (stating national gave directives regarding allocation, but concurrently claiming to not

know what the factors were); Whitt Dep. at 22:2-8 (DE 128-20) (stating there is no obligation to provide allocation under GDSI 2.0); *compare with* DE 87-1 at 3-4.

Lessor sanctions will not suffice here. HMA must already pay attorney's fees when Universal prevails (§ 320.697 Fla. Stat.). As such, ordering HMA to pay fees for part of the case, when it may very well have to pay for the whole case, will likely not have any effect on HMA, nor will it bring any relief to Universal. Similarly, striking responses will not help the situation either due to numerous contradictory responses. There should already be a presumption against HMA because it did not keep the records required and the burden shifts after a *prima facie* case is shown in Dealer Act claims. The issues which are the subject of HMA's obstruction (allocation decisions), are the "linchpin" of the case and the only way to preserve the integrity of the proceedings is to strike HMA's answer and enter a default in the case. HMA has disregarded its obligations throughout this case, and put the Court and Universal in a bind on how to proceed with a trial on the merits. HMA should not be allowed to reap the rewards of its own misconduct.

## Conclusion

Based on the foregoing Universal moves this Court to grant the equitable relief described above and sanction HMA by entering a default judgment or any other such other sanction the Court deems appropriate.

## COMPLIANCE WITH LOCAL RULE 3.01(g)

Plaintiff's counsel has conferred with Defendant's counsel in accordance with Local Rule 3.01(g) regarding this motion several times via email and via telephone on September 22, 2023. Counsel for Defendant opposes the relief sought herein.

Respectfully Submitted,

*s/ Jeremiah Hawkes*
Nicholas A. Bader (FBN 55351)
Jason T. Allen (FBN 25659)
Andrew G. Thomas (FBN 1018226)
Jeremiah M. Hawkes (FBN 472270)
**BASS SOX MERCER**
2822 Remington Green Circle
Tallahassee, Florida 32308
T: 850.878.6404
F: 850.942.4869
nbader@bsm-law.com
jallen@bsm-law.com
athomas@bsm-law.com
jhawkes@bsm-law.com

*Attorneys for Plaintiff Action Nissan, Inc.*

### CERTIFICATE OF SERVICE

*I HEREBY CERTIFY that on September 29, 2023, the foregoing was served via email on all counsel of record.*

*/s/ Jeremiah Hawkes*
Jeremiah Hawkes